UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CHARLES SHEPPARD,

        Plaintiff,

      v.                                  Case No. 22-cv-0902-bhl

JASMINE KORUS, et al.,

        Defendants.

---

## DECISION AND ORDER

---

Plaintiff Charles Sheppard, an inmate at New Lisbon Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Eighth Amendment claims in connection with Defendants' alleged deliberate indifference to (1) withdrawal symptoms he claims to have suffered after his medication was abruptly cancelled, (2) his threats of self-harm, and (3) the conditions of his confinement. On January 26, 2024, the State-employed Defendants and Defendant Christa Pierce separately moved for summary judgment.[1] For the reasons explained below, the Court will grant Pierce's summary judgment motion in its entirety and the State Defendants' motion only in part.

## BACKGROUND

At the relevant time, Sheppard was incarcerated at Fox Lake Correctional Institution, where Candace Whitman worked as the health services manager, Kristine DeYoung worked as a nurse, and Phillip Briski, Charles Congleton, Jr., Andrew Lyga, Matthew Larson, Jordan

---

[1] Pierce's motion did not comply with Civil L. R. 56(b)(1) in that she did not file a statement of proposed material facts as to which she contends there is no genuine issue and that entitle her to judgment as a matter of law. The Court will overlook this deficiency because she also joined the State Defendants' summary judgment motion, which complied with the local rules.

Wierenga, Carly Sandke, Scott Ross, Dana Miller, and Jasmine Korus worked as corrections staff. Also at the relevant time, Dr. Jeff Anders worked for the Wisconsin Department of Corrections Bureau of Health Services as the Psychiatry Director, and Pierce worked as a nurse practitioner who contracted with the Department of Corrections. Dkt. Nos. 73, 87 at ¶¶1-13; Dkt. No. 85 at 2.

## 1. The Discontinuation of Sheppard's Bupropion.

In the fall of 2019, Sheppard was taking bupropion, an antidepressant used to treat depression. On September 28, 2019, during a cell search, nine pills were found on a shelf in Sheppard's cell, two of which were identified as bupropion. Sheppard received a conduct report and was later found guilty of misusing bupropion. On October 7, 2019, Whitman noted Sheppard's misuse of bupropion in his chart and forwarded a note on the misuse to Pierce. Pierce reviewed Whitman's note on October 18, 2019, and in accordance with prison policy, discontinued Sheppard's prescription due to the misuse. The next day, on October 19, 2022, Sheppard submitted a health services request in which he stated that withdrawal symptoms were beginning and complained he was having "debilitating headaches." Dkt. Nos. 73, 87 at ¶¶20-21; Dkt. No. 75-2 at 22.

On October 20, 2019, Nurse DeYoung received a call from a restrictive housing unit officer reporting that Sheppard had been vomiting. DeYoung spoke to Sheppard who told her that he had vomited twice in the last hour. Sheppard also stated that he believed he was having increased irritability because the bupropion had been suddenly discontinued. DeYoung checked in with Sheppard again later that afternoon. The parties offer differing reports on this conversation. According to DeYoung, Sheppard told her his symptoms were resolved, so she ordered him a liter of Gatorade and a bagged lunch. Sheppard, on the other hand, insists he told DeYoung his symptoms had gotten worse. He asserts that he told her he was in extreme pain, was continuously

vomiting, had stomach cramps, was profusely sweating, and had defecated on himself. Dkt. Nos. 73, 87 at ¶¶24-24.

The following day, on October 21, 2019, Sheppard submitted a health services request stating that his withdrawal symptoms were worse and that he was having a hard time breathing. He asked to be restarted on bupropion. Whitman reviewed the request and called Pierce, who informed Whitman that withdrawal from bupropion is unlikely and that any symptoms should resolve quickly. Pierce advised Whitman that Sheppard's bupropion would not be restarted. The next day, on October 22, 2019, Whitman responded to Sheppard and informed him that she had spoken to his psychiatrist and that it was unlikely that his symptoms were related to the discontinuation of the bupropion. Dkt. Nos. 73, 87 at ¶¶25-30; Dkt. No. 75-2 at 23.

On October 25, 2019, Sheppard met with Pierce and informed her of his history of withdrawal symptoms when his bupropion had been cancelled. Pierce responded by re-prescribing Sheppard's bupropion. It is not clear why, but the medication was not given to Sheppard at that time. A few days later, on October 28, 2019, Pierce, Dr. Anders, and Whitman discussed Sheppard's case via email. Specifically, Pierce informed Dr. Anders that Sheppard had presented her with court documents and a psychiatric evaluation stating that bupropion was used to treat Sheppard's depression. She advised Dr. Anders that Sheppard had filed lawsuits in the past when his medication had been abruptly cancelled. She also informed him that she had adjusted Sheppard's prescription, and she asked for guidance on when to stop or taper medication in the event it is misused by an inmate.

Dr. Anders responded that bupropion should be stopped per policy after misuse, even if an outside psychiatrist supports the medication and even if the inmate threatens legal action. Dr. Anders also explained that, if there is a documented history of withdrawal symptoms, a taper could

3

be ordered for a few extra days or up to a week at most. Finally, Dr. Anders informed Pierce that for him to even consider approving bupropion, he would need clear evidence that Sheppard has had severe unremitting symptoms that responded only to bupropion after adequate trials of other medications. Dr. Anders suggested several other antidepressants Pierce could prescribe instead. Dkt. Nos. 73, 87 at ¶¶31-38.

Defendants explain that withdrawal symptoms with bupropion are not common. Those who do experience withdrawal may become irritated or agitated. Defendants also explain that bupropion has a high risk of misuse in a corrections environment, so it is very restricted. They note that there is a security concern that inmates may sell, barter, or even blackmail other inmates with it. Moreover, because bupropion has a higher chance of inducing seizures than other antidepressants, misuse of the medication poses a significant risk to inmates who have not been prescribed the medication. Dkt. Nos. 73, 87 at ¶¶34, 36, 39-41.

Pierce informed Dr. Anders that she would start a taper on November 1, 2019, but Whitman noted that Sheppard's prescription had not been restarted when she reordered it on October 25, 2019, and Sheppard had now been off the medication for more than a week. With these considerations in mind, Dr. Anders instructed Whitman not to restart the bupropion unless Sheppard was still experiencing significant withdrawal symptoms. Dr. Anders advised that Sheppard should consult with Pierce soon to discuss alternative medication options. Pierce reminded Dr. Anders that the psychiatric assessment Sheppard had shown her said he should be tapered off bupropion over the course of a month. But she clarified that Sheppard was doing fine and looked fine. Whitman expressed her belief that it would only make the situation worse if they restarted bupropion since he had been off it for over a week and, apart from the first couple days,

4

had been fine.  Dr. Anders, Pierce, and Whitman agreed that Sheppard would not be allowed to restart bupropion.  Dkt. Nos. 73, 87 at ¶¶41-48.

## 2.  Sheppard's Attempt at Self-Harm.[2]

Months later, at about 10 p.m. on December 24, 2019, DeYoung received a call from the restrictive housing unit informing her that Sheppard was observed pushing multiple pills out of a medication card and swallowing them.  The staff member informed her that Sheppard had taken lisinopril (to treat high blood pressure), hydrochlorothiazide (a water pill to treat high blood pressure and fluid retention), and ferrous gluconate (an iron supplement).  After DeYoung got off the call, she reviewed Sheppard's records to determine when the medications had last been refilled. She learned that the hydrochlorothiazide had been refilled on December 12, the ferrous gluconate on October 31, and the lisinopril on September 27, 2019.  Each new medication card contains thirty pills.  DeYoung also learned that Sheppard's medications had been converted from "keep on person" to "staff controlled" on December 19, 2019, when he was moved from general population to the restrictive housing unit.  In light of these discoveries, DeYoung doubted that Sheppard had multiple cards of medication available to him in his cell, or, if he had managed to keep medication cards, DeYoung believed the cards did not have many pills remaining.[3] Dkt. Nos. 73, 87 at ¶¶59-67.

---

[2] In the amended complaint, Sheppard alleged that he was taking bupropion, in part, to address his "auditory h[al]lucinations and suicidal proclivities" and that Pierce, Dr. Anders, and Whitman failed to replace the medication after they abruptly discontinued it.  Sheppard then alleged that he engaged in self-harm by swallowing pills. Construing the allegations broadly, the Court inferred that Sheppard's claims relating to the discontinuation of bupropion and his subsequent self-harm arose out of the same transaction, occurrence, or series of transactions or occurrences.  *See* Fed. R. Civ. P. 20.  Development of the record reveals otherwise.  Because these events do not arise out of the same transaction, the Court should not have allowed Sheppard to proceed with both claims in the same lawsuit.  *See George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007).  Given that both claims survived screening and the parties have completed discovery and filed dispositive motions addressing both, the Court will disregard Sheppard's failure to comply with Rule 20.

[3] Sheppard explains that contrary to policy and his medical records, his medication was always keep on person, regardless of whether he was in general population or the restrictive housing unit, but he provides no evidence suggesting that DeYoung knew that.

After reviewing Sheppard's records, DeYoung called the advance care provider who was on-call that night. DeYoung updated the provider based on what had been reported to her and what she learned from reviewing Sheppard's records. The provider recommended "watchful waiting," *i.e.*, closely watching the patient but not giving any treatment unless symptoms appear. By this time, Sheppard had been placed in "observation status" and was to be observed every fifteen minutes. Inmates are placed in observation status to prevent them from harming themselves or others. Observation cells are sparsely furnished, and an inmate's property is restricted to help ensure the inmate's safety. Psychological services decides the particular property that an inmate may have, with an emphasis on safety and security, while comfort is a secondary consideration. Generally, when an inmate is initially placed in observation status, he is allowed a suicide resistant smock and a security mat. Depending on an inmate's behavior, he may also be provided a security blanket. Psychological services staff conduct daily rounds, generally two times per shift, at which time they assess an inmate's placement and requests for additional property items. Corrections staff may also notify psychological services of an inmate's request for property via email or telephone. Dkt. Nos. 73, 87 at ¶¶68-98.

DeYoung explains that she knew Sheppard would be checked on every fifteen minutes and relied on corrections staff to let her know if they observed any change to his condition. It is undisputed that no one informed DeYoung of Sheppard experiencing adverse symptoms that evening, such as vomiting or feeling unwell, and there is no reference to Sheppard complaining about vomiting or feeling unwell in the observation log. Sheppard insists staff did not check on him every fifteen minutes and asserts that he told every officer who walked by his cell that he was sick, vomiting, and freezing cold. Dkt. Nos. 73, 87 at ¶¶68-81. If he did, there is no evidence such complaints were relayed to DeYoung.

Defendants do not recall Sheppard complaining about being cold or wanting a security blanket. They further explain that, if Sheppard had made such a request, they would have documented the request on the observation log and would have called psychological services to notify staff of the request. Sheppard insists he repeatedly informed staff he was vomiting, cold, and wanted a blanket. Sheppard received a blanket at noon the day after he was placed in observation when he spoke to a psychological services staff member. According to Defendants, the temperature in the restrictive housing unit is typically kept between 70 and 75 degrees. There were no work orders from December 2019 relating to complaints about the heat in the restrictive housing unit. Dkt. Nos. 73, 87 at ¶¶105-126.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an

7

element essential to the party's case, and on which that party will bear the burden of proof at trial."

*Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

**1. No jury could reasonably conclude that Dr. Anders, Whitman, and Pierce were deliberately indifferent to Sheppard's serious medical condition.**

To prevail on a deliberate indifference claim under the Eighth Amendment, a plaintiff must prove that prison officials intentionally disregarded a known, objectively serious medical condition that posed an excessive risk to the plaintiff's health. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted). When assessing whether a prison official acted with the requisite state of mind, courts must "examine the totality of an inmate's medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (citations omitted). The Seventh Circuit has made clear that, to establish the requisite mental state, "something more than negligence or even malpractice is required." *Id.* Further, it is not enough for a plaintiff merely to show he disagrees with a medical provider's decision or even that medical providers disagree with each other. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Instead, a plaintiff must show that a provider's exercise of medical judgment was "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.*

No jury could reasonably conclude that Pierce was deliberately indifferent to the risk of withdrawal symptoms when she cancelled Sheppard's prescription for bupropion after learning that he had received a conduct report for misusing the medication. As Defendants explain, bupropion has a high risk of misuse in the correctional setting and poses a significant risk to inmates who have not been prescribed the medication because it can induce seizures. Further, Defendants explain that withdrawal symptoms from bupropion are uncommon, with the most likely side effect being irritability. The record shows that Sheppard had been found to have

8

misused his medication, there was a low risk of withdrawal symptoms generally, and a high risk of harm to other inmates. Given these undisputed facts, no jury could reasonably conclude that Pierce violated the Eighth Amendment when she abruptly cancelled the prescription.

Sheppard asserts that, however unlikely withdrawal symptoms may be generally, he specifically suffered extreme side effects, including headaches, trouble breathing, vomiting, and stomach cramps. Even if this is true, however, Sheppard presents no evidence suggesting Pierce was aware of Sheppard's claimed unique vulnerability to withdrawal symptoms.[4] And the record shows she took steps to address his concerns when these issues came to her attention. The evidence confirms that once Sheppard provided Pierce with this information and explained to her what he was experiencing, she placed an order to restart the medication. Such a response refutes any claim that she was deliberately indifferent to his withdrawal symptoms.

It is unclear from the record why the medication was not immediately given to Sheppard once Pierce re-ordered it (or who was responsible for not following her order), but three days later, Pierce, Whitman, and Dr. Anders discussed how to proceed. Dr. Anders explained that, generally, a medication must be immediately cancelled once it is determined that an inmate has abused the medication. The risk to other inmates is simply too high to allow an inmate who has misused the medication to continue to possess it. Still, Dr. Anders acknowledged that, when there are well-documented side effects, a taper of a few days up to a week may be appropriate. Whitman and Pierce both acknowledged that Sheppard had reported side effects, including vomiting, breathing troubles, and headaches, during the first two days after his medication was cancelled, but they also

_____

[4] Sheppard states that Pierce, Dr. Anders, and Whitman "were aware" that he had suffered painful withdrawal symptoms "before making the decision to stop my bupropion without a taper," *see* Dkt. No. 98 at ¶7, but he provides no evidence to support this statement. His unilateral assertions of what other knew is not evidence and there is nothing in the record suggesting that any of these Defendants knew of any prior experiences he may have had at the time Pierce cancelled his prescription.

noted that since then he had been fine, and it had now been more than a week since the medication had been cancelled. Given the record, this was a reasonable approach.

Sheppard has provided no evidence that he continued to experience side effects past the first two days following the medication's cancellation. And, even if he did, he also offers no evidence that he alerted anyone in the health services unit beyond the side effects he complained of on the first few days. Given that Pierce, Dr. Anders, and Whitman undisputedly believed that any withdrawal symptoms would resolve within a few days, it was reasonable for them to assume that Sheppard's silence indicated he was no longer experiencing withdrawal symptoms. Accordingly, no jury could reasonably conclude that they were deliberately indifferent to his withdrawal symptoms when they decided not to re-start the medication just to taper him off the medication. As Whitman observed, given that his withdrawal symptoms had apparently resolved, re-starting the medication would only make the situation worse.

In sum, no jury could reasonably conclude that Pierce, Dr. Anders, and Whitman's careful consideration of Sheppard's needs in light of other important considerations such as institution security and inmate safety demonstrated their deliberate indifference to his serious condition. Sheppard may disagree with the conclusions they reached, but his disagreement without more is insufficient to support an Eighth Amendment claim.

**2. A jury could reasonably conclude that Miller and Korus were deliberately indifferent to Sheppard's threats of self-harm; however, the parties do not dispute that Ross is entitled to summary judgment.**

Sheppard is also proceeding on a claim that Miller, Korus, and Ross were deliberately indifferent to the risk of harm he posed to himself on the night of December 24, 2019. According to the amended complaint, Sheppard told these Defendants he was going to commit self-harm and needed to be placed on observation status. He asserts that he tried to give them blister packs of

10

medication, but they ignored his pleas for help. Dkt. No. 9 at 2-3. As an initial matter, Sheppard's claim against Ross must be dismissed because Sheppard does not dispute that Ross was not working at the time of the alleged incident. Dkt. Nos. 73, 87 at ¶¶122-23. Miller and Korus concede there is a dispute regarding their interactions with Sheppard, but they argue that they are nonetheless entitled to summary judgment because Sheppard has not shown any evidence of injury. *See* Dkt. No. 72 at 8 (citing *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020)).

According to Miller and Korus, Sheppard cannot show he was injured when he swallowed an undetermined number of pills because the on-call doctor ordered only that Sheppard be observed for symptoms and the observation log indicates that Sheppard was checked every fifteen minutes and that he slept through the night. But Sheppard disputes the observation log entries. According to Sheppard, he was checked on about every hour and told "[e]very single officer and staff member that walked past his cell" that he was sick, had been vomiting, and needed to go to the emergency room. Dkt. No. 98 at ¶12. If a jury were to believe Sheppard regarding how he responded to ingesting the pills, it could reasonably conclude that he was injured by Miller and Korus' alleged failure to respond to his threats of self-harm and to take the pills from him as he requested. Miller and Korus are therefore not entitled to summary judgment.

**3. A jury could not reasonably conclude that DeYoung was deliberately indifferent to Sheppard's serious medical condition.**

Sheppard argues that DeYoung demonstrated deliberate indifference to his serious medical needs based on her conduct after she received a report that he had been observed swallowing pills. Sheppard insists that she should have immediately sent him to the emergency room rather than placing him in observation status. But based on the record before the Court, no jury could reasonably agree with Sheppard's assessment that DeYoung was deliberately indifferent to the risk of harm he faced. DeYoung explains that after she received notice that Sheppard had swallowed

11

some pills, she consulted his medication records to identify the pills he had been prescribed and to gauge how many of those pills he possibly possessed. DeYoung first noted that Sheppard's medication had been converted from keep on person to staff controlled about a week earlier, leading her to conclude that it was unlikely he possessed multiple medication cards. Next, even assuming Sheppard had managed to keep some of his medication cards, she noted that two of his medications had been last refilled months earlier, indicating to her that there would be few pills left in those cards (each card contains about thirty pills). The third medication had been refilled about two weeks earlier, which indicated that card was about half full.

DeYoung gathered this information and presented it to the on-call doctor, who recommended that Sheppard be closely observed to see if he developed symptoms. No jury could reasonably conclude that DeYoung's decision to consult with and defer to the expertise of the on-call doctor violated Sheppard's rights. *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("[N]urses may generally defer to instructions given by physicians" unless "it is apparent that the physician's order will likely harm the patient."). There is no evidence suggesting that, at the time DeYoung implemented the on-call doctor's order, she knew that Sheppard was suffering symptoms that required emergency treatment. Accordingly, no jury could reasonably conclude that she had reason to know Sheppard would be harmed by the doctor's order.

Sheppard asserts that after he was placed in observation status, he felt very sick and repeatedly vomited, but he presents no evidence to rebut DeYoung's assertions that she was never informed of changes in Sheppard's condition. DeYoung reasonably relied on corrections staff to inform her of any changes to Sheppard's physical condition, and she could not have been deliberately indifferent to symptoms she did not know about. Accordingly, she is entitled to summary judgment.

12

**4. A jury could not reasonably conclude that Sheppard was exposed to sufficiently serious conditions of confinement; however, it could reasonably conclude that Lyga, Briski, and Standke were deliberately indifferent to his serious medical needs.**

Finally, Sheppard asserts that, after he was placed in observation status sometime after 10 p.m. on December 24, 2019, he reported throughout the night that he was vomiting and cold. He asserts that he repeatedly asked for a security blanket but did not receive one until about noon the following day. To prevail on a conditions of confinement claim, a plaintiff must show that (1) there was a deprivation that was, from an objective standpoint, sufficiently serious enough to result in the denial of the minimal civilized measure of life's necessities, and (2) that prison officials were deliberately indifferent to those conditions. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016).

No jury could reasonably conclude that Sheppard was exposed to excessively cold temperatures such that he was subjected to a risk of serious harm. Defendants have provided evidence that the temperature in the restrictive housing unit was between 70 and 75 degrees on the night at issue. There were no other complaints of cold that night and there were no work orders entered regarding the temperature. Sheppard asserts that he felt cold, but he presents no evidence to rebut Defendants' evidence of the temperature in his cell. Undoubtedly, Sheppard was uncomfortable wearing only an ill-fitting security smock (required because of his attempt to harm himself), but no jury could conclude that having to do so for about fourteen hours in a cell that was heated to at least 70 degrees was so extreme as to violate the Eighth Amendment. *See, e.g., Daniels v. Hicky*, No. 11-C-4151, 2012 WL 4759235, at *8 (N.D. Ill. Oct. 5, 2012) (temperature in cell ranging from 70 to 73 degrees); *Armstrong v. Brann*, No. 04-C-884, 2006 WL 3422570, at *5 (E.D. Wis. 2006) (temperature in cell ranging from 65 to 68 degrees); *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("The Constitution does not mandate comfortable prisons . . . .").

13

A jury could, however, conclude that Lyga, Briski, and Standke were deliberately indifferent to Sheppard's serious medical needs. Sheppard asserts that, contrary to the observation log entries, he repeatedly informed officers that he was vomiting. He further asserts that he felt like he was going to die. DeYoung asserts that she was relying on corrections staff to inform her if Sheppard's condition changed, and she also asserts that reports of vomiting would have been followed up by a nurse to determine if additional treatment (*i.e.*, sending Sheppard to the emergency room) was required. Dkt. No. 80 at ¶27. Accordingly, were a jury to believe Sheppard's version, it could reasonably conclude that officers' failure to report his worsening condition to DeYoung demonstrated deliberate indifference to a substantial risk of serious harm.

It is not entirely clear when Sheppard stopped vomiting, but he states in his amended complaint that he was "vomiting without assistance for over 14 hours," suggesting that he felt better by about noon on December 25, 2019, when he talked to someone from psychological services and was given a security blanket. Dkt. No. 9 at 5. It is undisputed that Congleton, Larson, and Wierenga did not interact with Sheppard until the evening of December 25 and into December 26, 2019. Dkt. No. 73 at ¶¶113, 116, 118. Based on Sheppard's version of events, these defendants could not have been deliberately indifferent to Sheppard's complaints because they did not interact with him during the time he claims he was vomiting and felt like he might die (from about 10 p.m. on December 24 through noon on December 25, 2019). Congleton, Larson, and Wierenga are therefore entitled to summary judgment. It is undisputed, however, that Lyga and Briski interacted with Sheppard in the early hours of December 25, 2019 before his symptoms resolved. Dkt. No. 73 at ¶¶111, 115. The record is unclear about when Standke interacted with Sheppard. Accordingly, Lyga, Briski, and Standke are not entitled to summary judgment on this aspect of Sheppard's claim.

**NEXT STEPS**

Sheppard's claims against Korus, Miller, Briski, Lyga, and Standke will proceed to trial. Given the difficulty of trying a case before a jury, including offering a coherent opening statement and closing argument, presenting and examining witnesses, and locating and introducing evidence, the Court will attempt to recruit a volunteer lawyer to represent Sheppard at trial. The demand for volunteer lawyers is high, but the supply is low. Few lawyers have the time, ability, or experience to volunteer for cases such as these. The Court encourages Sheppard to be patient as it makes efforts to recruit a lawyer to represent him. The process may take some time. The Court will promptly notify Sheppard in the event a lawyer volunteers to represent him. In the meantime, the Court encourages the parties to explore whether settlement is possible.

**IT IS THEREFORE ORDERED** that Defendant Christa Pierce's summary judgment motion (Dkt. No. 84) is **GRANTED** and the State Defendants' summary judgment motion (Dkt. No. 71) is **GRANTED in part** and **DENIED in part**. Charles Sheppard's claims against Kristine DeYoung, Candace Whitman, Jeff Anders, Scott Ross, Charles Congleton, Jordan Wierenga, and Matthew Larson are **DISMISSED**, and his claims against Jasmine Korus, Dana Miller, Phillip Briski, Andrew Lyga, and Carly Standke will proceed to trial.

Dated at Milwaukee, Wisconsin on June 3, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

15